UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                          :
DARRAN SAMUEL,                            :
                                          :
                Petitioner,               :    **MEMORANDUM**
                                          :    **DECISION AND ORDER**
                                          :
                - against -               :    12 Civ. 2372  (BMC)
                                          :
THOMAS LAVALLEY, Superintendent,          :
Clinton Correctional Facility; ERIC T.    :
SCHNEIDERMAN,  New York State Attorney    :
General,                                  :
                                          :
                Respondents.              :
                                          :
-------------------------------------------------------- X

**COGAN,** District Judge.

Petitioner brings this proceeding for a writ of habeas corpus pursuant to 28 U.S.C. §
2254, challenging his convictions for murder in the second degree, robbery in the first degree,
and attempted robbery in the second degree. For the reasons set forth below, the petition is
denied.

## BACKGROUND

The evidence adduced during trial showed that on July 2, 2005, petitioner, who was 16
years old at the time, and a group of boys, approached another group of four boys, who were
standing at a bus stop in Brooklyn. Petitioner demanded the iPod that one of the boys was
holding. Several other young men, including petitioner's older cousin, Aaron Farrell, had been
watching this encounter from across the street. When the victim resisted, petitioner jumped on
the boy and then gestured for the onlookers to join. Farrell and others began fighting with the
four boys. During the fight, someone stabbed one of the four boys, Chris Rose, in the chest, and
he died. Petitioner was eventually arrested.

Following a jury trial in the Supreme Court of New York, Kings County, petitioner was convicted of murder in the second degree, robbery in the first degree, and attempted robbery in the second degree. He was sentenced to concurrent prison terms of 22 years to life for the murder, 22 years and 5 years of post-release supervision for the first-degree robbery, and 7 years and 3 years of post-release supervision for the attempted second-degree robbery.

Petitioner appealed his convictions to the Appellate Division, Second Department, asserting that: (1) the jury's verdict convicting him of felony murder was against the weight of the evidence, because defendant had established an affirmative defense to this crime; (2) his first-degree robbery conviction was unsupported by legally sufficient evidence; and (3) the prosecutor committed misconduct by asking him improper questions about statements petitioner had made during a proffer session, inquiring about petitioner's post-arrest silence, stating that petitioner was lying to make out the affirmative defense to felony murder, and by making numerous appeals to the jury's fears and sympathy for the victim.

At the very end of Point III in his brief, i.e., the allegation of prosecutorial misconduct, petitioner conceded that his defense counsel had failed to preserve this argument. He appealed, in a single sentence, for the Appellate Division to hear the argument under its discretionary "interest of justice" jurisdiction, notwithstanding the failure to preserve. This was followed, again in a single sentence, by an assertion that "[a]lternatively," the Court should find defense counsel ineffective for failing to object to nearly all of the prosecutor's misconduct. Although petitioner cited Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), at the end of that sentence, he did not argue how the failure to assert an objection to the alleged prosecutorial misconduct ran afoul of Strickland.

2

The Appellate Division affirmed the judgment of conviction, rejecting the first two arguments made by petitioner as procedurally barred or alternatively without merit. With respect to petitioner's third argument regarding prosecutorial misconduct, the Appellate Division held that although some of the prosecutor's questions and comments on cross-examination were improper, any error was harmless, because there was "overwhelming evidence" of guilt, and no significant probability that the error contributed to petitioner's convictions. The Appellate Division also summarily concluded that defendant was not deprived of the effective assistance of counsel. The New York Court of Appeals denied petitioner's request for leave to appeal. People v. Samuel, 88 A.D.3d 1020, 931 N.Y.S.2d 403 (2d Dep't 2011), leave to app. den., 18 N.Y.3d 861, 938 N.Y.S.2d 869 (2011) (table).

Petitioner's sole claim in this habeas corpus petition is based on the "alternative" argument he alluded to in the last sentence of his brief – that he was denied his Sixth Amendment right to effective assistance of counsel because his attorney failed to object to the prosecutor's numerous improper questions and comments during the trial. Petitioner argues that the Appellate Division's rejection of petitioner's ineffective assistance claim resulted in a decision that involved an unreasonable application of Strickland, and that the Court should grant a writ of habeas corpus.

**DISCUSSION**

**I.  Exhaustion**

Before the Court may consider the merits of the petition, the Court must first determine whether petitioner has exhausted all of his state remedies in pursuing his ineffective assistance of counsel claim. In the interest of comity and pursuant to the requirements of 28 U.S.C. § 2254(b), federal courts will not consider a constitutional challenge that has not first been "fairly

presented" to the state courts. See Ayala v. Speckard, 89 F.3d 91, 94 (2d Cir. 1996) (citing Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509 (1971)).

Here, petitioner may have exhausted his ineffective assistance claim by raising it in the Appellate Division, but barely. While petitioner devoted pages of argument in his appellate brief as to why the prosecutor's misconduct at trial deprived him of his right to a fair trial, all petitioner did in support of his ineffective assistance of counsel claim was include the following sentence: "Alternatively, this Court should find defense counsel ineffective for failing to object to nearly all of the prosecutor's misconduct. Strickland, 466 U.S. 668, 687-688, 694 (1984); People v. Caban, 5 N.Y.3d 142, 155 (2005); People v. Baldi, 54 N.Y.2d 137, 147 (1981)." There is no mention of either of Strickland's two requirements or any argument as to how defense counsel's failure to object was objectively unreasonable or prejudicial.

Since the exhaustion requirement is satisfied if a petitioner relies on "pertinent federal cases employing constitutional analysis," Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), petitioner's single sentence reference to Strickland is sufficient.[1] However, petitioner's failure to make any argument at all as to why counsel was ineffective makes it more difficult for petitioner to obtain federal habeas corpus relief from the Appellate Division's rejection of that claim. Because the Supreme Court in Strickland pronounced a general rule and petitioner made no effort on appeal to explain how it applied to his case, the range of reasonable application of precedent available to the Appellate Division was broad indeed. As the Supreme Court has noted:

---

[1] It may be appropriate for the Circuit to consider at some point whether Daye's definition of exhaustion should be revisited in light of the subsequent enactment of AEDPA, with its insistence on meaningful exhaustion, its narrowing of federal review of state convictions generally, and the practice that has developed among state appellate defense lawyers of alluding to federal claims only in passing, either by a federal citation in a point heading, or, as here, a conclusory assertion in the last sentence of a brief. I am just not sure it is realistic to expect the state courts to seriously consider federal claims asserted in so perfunctory a fashion. However, in the instant case, since the Appellate Division did address the point, albeit with the same brevity as petitioner's appellate lawyer, and since Daye is of course controlling authority, I will deem the claim exhausted.

4

[T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004). And in Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411 (2009), the Supreme Court confirmed that Strickland falls within the category of general rules: "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied the standard."

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that a federal court may grant habeas relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings, only if the adjudication of the claim resulted in a decision that was (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d). The decision of a state court is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to the relevant Supreme Court precedent. Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495 (2000) (quotations omitted)). Moreover, a state-court decision involves "an unreasonable application" of clearly established Federal law if the state court applies federal law to the facts of the case in an objectively unreasonable manner. See Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432 (2005).

5

The Supreme Court has clarified that the AEDPA standard of review is extremely narrow, and is intended only as "'a guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, --- U.S. ---, ---, 131 S. Ct. 770, 786 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5, 99 S. Ct. 2781 (1979) (Stevens, J., concurring)). State court decisions must "be given the benefit of the doubt," Felkner v. Jackson, --- U.S. ---, ---, 131 S. Ct. 1305, 1308 (2011) (citing Renico v. Lett, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010)), and "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." Harrington, 131 S. Ct. at 786. Indeed, in Harrington, the Supreme Court went so far as to hold that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. This standard of "no possibility" of disagreement among "fairminded jurists" as to the existence of legal error is arguably the narrowest standard of judicial review in the law. Moreover, in a recent opinion, the Supreme Court clearly expressed a lack of patience with lower courts that view its pronouncements as permitting a substantial measure of flexibility in applying this standard. See Parker v. Matthews, --- U.S. ---, 132 S. Ct. 2148 (2012).[2]

In the present case, the issue before the Court is whether the Appellate Division's decision was contrary to, or involved an unreasonable application of, the standard set forth by the

---

[2] Harrington and Cavazos v. Smith, --- U.S. ---, 132 S. Ct. 2 (2011), may have abrogated the oft-quoted language in Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000), that while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." The Harrington/Cavazos standard may not quite require "judicial incompetence," id., but by precluding relief except where the error is "beyond any possibility for fairminded disagreement," it certainly comes close. The Second Circuit has noted that these Supreme Court decisions have narrowed the standard of habeas review that the Circuit previously applied. See Rivera v. Cuomo, 664 F.3d 20 (2d Cir. 2011) (granting motion to vacate its earlier decision granting habeas relief upon consideration of Cavazos), vacating, Rivera v. Cuomo, 649 F.3d 132 (2d Cir. 2011).

6

Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), in determining that petitioner was not deprived of effective assistance of counsel.

To satisfy the first prong of the two-part test, the performance prong, petitioner must show that counsel's performance "fell below an objective standard of reasonableness." <u>Id.</u> at 688, 104 S. Ct. 2052. The record must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> at 687, 104 S. Ct. 2052. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> Nonetheless, this presumption may be overcome with evidence that counsel's conduct lacked a legitimate strategic basis. <u>Id.</u> "Omissions [that] cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness," may fall below the constitutional minimum standard of effectiveness." <u>Id.</u>

To satisfy the second prong, the prejudice prong, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. 2052. "This requires a 'substantial,' not just 'conceivable,' likelihood of a different result." <u>Cullen v. Pinholster</u>, --- U.S. ---, ---, 131 S. Ct. 1388, 1403 (2011) (citing <u>Harrington</u>, --- U.S. at ---, 131 S. Ct. at 791).

Courts must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." <u>Strickland</u>, 466 U.S. at 696, 104 S. Ct. 2052. Moreover, "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial." <u>Id.</u> at 689, 104 S. Ct.

2052. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Cullen v. Pinholster, --- U.S. ---, ---, 131 S. Ct. 1388, 1403 (2011) (quoting Strickland, 466 U.S. at 686, 104 S. Ct. 2052).

Finally, the Court recognizes that because "[t]he standards created by Strickland and § 2254(d) are both 'highly deferential,'" "when the two apply in tandem, review is 'doubly' so." Harrington, --- U.S. ---, 131 S. Ct. 770, 788 (2011) (quoting Knowles v. Mirzayance, --- U.S. ---, 129 S. Ct. 1411, 1420 (2009)).

The Appellate Division, in determining that petitioner was not deprived of the effective assistance of counsel, examined petitioner's claim under New York's standard for ineffective assistance, considering "the totality of the evidence, the law, and the circumstances of the case." Even though the Appellate Division provided little rationale for its rejection of petitioner's claim, it is clear that the claim was "adjudicated on the merits" and this Court's review must be conducted pursuant to section 2254(d). See Cullen v. Pinholster, --- U.S. ---, ---, 131 S. Ct. 1388, 1402 (2011) (section 2254(d) applies "even where there has been a summary denial").

Therefore, the question before this Court is whether the Appellate Division's decision was an unreasonable application of the Strickland test for ineffective assistance of counsel.[3] The Supreme Court has emphasized that for purposes of § 2254(d)(1), "'an unreasonable application of federal law is different from an incorrect application of federal law,'" and that "[a] state court

---

[3] Petitioner, not surprisingly, does not argue that the state court's decision was "contrary to" the Strickland standard. The Second Circuit has repeatedly held that although New York's test for ineffective assistance of counsel under the state constitution differs from the federal Strickland standard, "New York['s] "meaningful representation" standard is not contrary to the Strickland standard. See Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010) (citing Eze v. Senkowski, 321 F.3d 110 (2d Cir. 2003); Lindstadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001)). "Even if the errors are harmless in the sense that the outcome would remain the same, a defendant may still meet the New York prejudice standard by demonstrating that the proceedings were fundamentally unfair. This is not a novel view – New York state courts have repeatedly asserted that the New York standard is, in practice and in intent, more generous to defendants than the federal standard." Rosario, 601 F.3d at 125-26 (concluding that, properly applied, the New York standard is not contrary to Strickland).

8

must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Harrington, --- U.S. ---, ---, 131 S. Ct. 770, 785 (2011). The Supreme Court further instructed that "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

### III. Objective Unreasonableness

#### A. Defense Counsel's Failure to Object to Questions about Proffer Meeting

The first of four allegations of ineffective assistance of counsel pertain to defense counsel's failure to object to questions about petitioner's proffer meeting. Petitioner argues that the prosecutor's use of alleged statements from petitioner's proffer meeting was impermissible under New York law, and that his counsel should have, but failed to, object to these questions. Petitioner argues that these questions were improper because the prosecutor became an unsworn witness and pitted his credibility against petitioner's when he repeatedly asked about statements petitioner and defense counsel at the time, Stephen Flamhaft, had allegedly made during a plea meeting. The relevant line of questioning is as follows:

Prosecutor: Do you remember being told, by Mr. Flamhaft, and myself, that anything you say in my office couldn't be used against you, unless one thing happened?

Petitioner: Yes.

Prosecutor: What was that one thing?

Petitioner: I can't remember.

Prosecutor: That was, if you came in here and lied.

9

Petitioner: I did not lie.

Prosecutor: Well, didn't you tell me . . . that Funko was the guy who did the stabbing?

Petitioner: No, I did not.

Prosecutor: Mr. Samuel, before you came into my office, . . . you had a chance to talk to Mr. Flamhaft in a holding cell in my office, do you remember that?

Petitioner: Yes.

. . .

Prosecutor: Mr. Flamhaft told you to tell the truth because that's the only way you're going to help yourself, right?

Petitioner: Yes. I, and I did tell the truth.

Prosecutor: You started off by telling us . . . that Funko did the stabbing?

Petitioner: No, I did not. I said, Aaron Farrell.

Prosecutor: Well, do you remember your attorney telling you during that proffer sessions, to stop lying and tell the truth because that's the only way you are going to help yourself?

Petitioner: No, I don't remember that.

Prosecutor: You don't remember during . . . that proffer session saying: [']Okay. I will stop the games.[']

Petitioner: I wouldn't remember what that is . . . .

. . .

Prosecutor: [D]o you remember [Mr. Flamhart] telling you . . . to stop the nonsense and tell the truth?

Petitioner: No, I do not.

Prosecutor: Do you remember saying that the reason you cut your hand is because Funko was trying to stab the smaller boy and you grabbed the knife, that's why your fingerprints are on the knife and your blood's on the knife?

Petitioner: No. That's a lie.

Prosecutor: That's a lie?

Petitioner: All a lie.

Petitioner argues that in addition to these questions about "Funko" and the blood from the knife, the prosecutor also asked whether petitioner had told him at the proffer meeting that Farrell was a Crips leader, after petitioner testified that he did not know whether Farrell was a Crips leader. Similarly, after petitioner denied that he had lied when he told the detectives that the blood on his sneakers was from when he tried to break up Jamar's fight, the prosecutor asked whether he had told the prosecutor at the meeting that the blood came from a cut he got on his hand when he grabbed the knife during the charged incident.

It would be difficult to find defense counsel's failure to object to these questions as objectively reasonable under New York law. The New York Court of Appeals has reversed convictions where the prosecutor has expressed his personal belief on matters which may influence the jury, has argued his own credibility on summation, has vouched for the credibility of the People's witnesses, or has, by cross-examination, suggested the existence of facts not in evidence. People v. Paperno, 54 N.Y.2d 294, 300-01, 445 N.Y.S.2d 119 (1981) (citations omitted). The Court of Appeals has explained that "such conduct . . . amounts to a subtle form of testimony against the defendant, as to which the defendant may have no effective means of cross-examination" and warned of "the possible danger that the jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor." Id.[4]

---

[4] In People v. Ramashwar, 299 A.D.2d 496, 749 N.Y.S.2d 886 (2d Dep't 2002), the Appellate Division reversed a conviction, in the interest of justice, after the prosecutor in that case questioned two defense witnesses regarding their prior statements to her in a telephone interview, and then tried to impeach them with their alleged prior

11

In the present case, the prosecutor injected his own credibility when he examined petitioner with leading questions about statements petitioner allegedly made at the proffer meeting. Questions by the prosecutor like, "Well, didn't you tell me . . . that Funko was the guy who did the stabbing?" present the jury with one of two choices: believe the prosecutor, or believe the defendant. It is a real possibility that faced with such a choice, a jury would afford greater weight to the subtle testimony of a prosecutor than to the denials of a criminal defendant charged with murder and robbery. To make matters worse, the prosecutor quoted petitioner's counsel's instruction to petitioner during the proffer session that petitioner should "stop the nonsense and tell the truth." He thus turned the defense lawyer against his own client, and created the inference that both lawyers were on the side of the truth and it was petitioner who was on the other side.

Therefore, the Appellate Division could not reasonably apply Strickland to conclude that the prosecutor's questions were proper under New York law or that defense counsel's failure to object to these questions was objectively reasonable. There is no conceivable strategic purpose for failing to object to these questions. Defense counsel's omission could only have arisen from "oversight, carelessness . . . [or] ineptitude . . . ." See Wilson v. Mazzuca, 570 F.3d 490, 502 (2d Cir. 2009) (quotation omitted).

B. Defense Counsel's Failure to Object to Questions about Post-Arrest Silence

The second allegation of ineffective assistance of counsel is defense counsel's failure to object to the following questions about petitioner's post-arrest silence:

Prosecutor:     Now, when you get arrested you get put in the back of a police car
                and brought to the 67th Precinct, correct?

---

responses. The Appellate Division held that in doing so, "the prosecutor's credibility became an issue at trial and deprived the defendant of a fair trial."

12

Petitioner: Yes.

Prosecutor: During that period of time, do you tell any of the police officers that are driving you to the precinct: My cousin, Aaron, did the stabbing?

Petitioner: No, I did not. I had no conversation with them. They were driving.

Prosecutor: They didn't say a word to you and you didn't say a word to them?

Petitioner: No. They were asking me my address, my name, how old am I. That's it.

Petitioner argues that the prosecutor improperly elicited this exchange with the police officer in an attempt to show that petitioner lied when he testified that Farrell was the ringleader who ultimately stabbed Rose. The inference the prosecutor encouraged the jury to draw was that had Farrell really stabbed Rose, petitioner would have admitted it to the police officers during the car ride to the precinct. Petitioner asserts that under well-established New York law, such questioning by the prosecutor is improper, and that defense counsel should have objected to these questions.

Once again, it would be difficult to find defense counsel's failure to object to these questions as objectively reasonable under New York law. Although federal law, and thus the Constitution, permits the use of a defendant's silence for impeachment purposes, see Jenkins v. Anderson, 447 U.S. 231, 100 S. Ct. 2124 (1980), New York law does not. See People v. DeGeorge, 73 N.Y.2d 614, 543 N.Y.S.2d 11 (1989); People v. Conyers, 52 N.Y.2d 454, 438 N.Y.S.2d 741 (1981). The New York Court of Appeals reasons that a defendant may have numerous reasons for remaining silent, and thus the prejudicial impact of such evidence outweighs its probative value. DeGeorge, 73 N.Y.2d at 618-19, 543 N.Y.S.2d 11.

Respondent, citing several New York cases, argues that because petitioner waived his right to remain silent, the prosecutor was allowed to question him about his post-arrest silence. It is correct that, where a defendant, waiving his right to remain silent, gives a statement to the police, but omits significant exculpatory information which is later presented at trial, the defendant may be impeached by omission. See People v. Savage, 50 N.Y.2d 673, 431 N.Y.S.2d 382 (1980). In the present case, petitioner did, in fact, waive his right to remain silent and provide the officers with a post-arrest statement.

However, critically, the post-arrest silence to which the prosecutor referred occurred while petitioner was riding in the police officers' car, on his way to the precinct, which was before petitioner waived his right to remain silent. Under New York law, the prosecutor was not permitted to ask petitioner about his silence during the car ride, even though, at that point, no Miranda warnings had been administered to petitioner. Therefore, the Appellate Division could not have reasonably determined under Strickland that the prosecutor's questions were permissible, or that the failure to object was objectively reasonable.

## C. Defense Counsel's Failure to Object to Prosecutor's Accusations during Summation that Petitioner Lied to Jury

The third allegation of ineffective assistance of counsel involves defense counsel's failure to object to the prosecutor's repeated accusations that petitioner lied to the jury. Petitioner argues that during the prosecutor's summation, the prosecutor accused petitioner of trying to "fool [the jury]" and stated on several occasions that he was trying to "get over on [them]" to "avoid responsibility." He also said, at least eight times, that petitioner told the jury "lies," and did not "tell [] them the truth" and was "lying" to them, again, to "avoid responsibility" for what he had done. Once, instead of overtly accusing petitioner of lying, the prosecutor stated that petitioner "knows from all the testimony" "that he's guilty of murder" and that "[i]f [he] didn't

14

know back then, he certainly knew it when he took the stand." The prosecutor further asked the jury whether petitioner's testimony that the detectives lied when they said petitioner told them that another participant was the stabber "even pass[ed] the laugh test."

Again, it is hard to see objective reasonableness under New York law in defense counsel's failure to object. Petitioner argues that courts in New York have granted a new trial in criminal cases where the defendant is called a "liar" or his testimony "lies." There is much case law support for this argument. See People v. Ortiz, 33 A.D.3d 432, 822 N.Y.S. 2d 518 (1st Dep't 2006) (holding that the cumulative effect of a prosecutor's improper conduct at trial, which included repeatedly characterizing defendant as a liar and his defense a lie, and forcing defendant to accuse prosecution witnesses, a detective and a family court judge, of lying, deprived defendant of a fair trial); People v. Wlsaiuk, 32 A.D.3d 674, 681, 821 N.Y.S. 2d 285 (3d Dep't 2006) (ordering new trial where prosecutor repeatedly expressed a personal opinion concerning the merits of particular evidence, disparaged defendant, characterized his testimony and that of his witnesses as "lies", and maligned defense counsel and his arguments); People v. Russell, 307 A.D.2d 385, 387, 761 N.Y.S.2d 400 (3d Dep't 2003) (ordering new trial, in the interest of justice, where prosecutor's summation referred to various statements made by defendant as lies and "tall tale[s]," commented that defendant's appearance was suggestive of dishonesty, referred to defendant's possession of a Bible as a "prop" and characterized defendant's crying on the stand as an attempt to evoke juror sympathy); People v. Fiori, 262 A.D.2d 1081, 1081, 693 N.Y.S.2d 357 (4th Dep't 1999) (granting a new trial where, among other things, prosecutor denigrated the defense, vouching for the credibility of the People's witnesses, and called defendant a liar).

15

Thus, the Appellate Division could not have determined that many, if not all, of the prosecutor's challenged comments were proper and that the prosecutor merely responded to defense counsel's summation. The record shows that the prosecutor attacked defendant's affirmative defense by repeatedly and inappropriately calling defendant a "liar." There is no conceivable basis for counsel's failure to object, and thus no application of Strickland that could find the omission objectively reasonable.

### D. Defense Counsel's Failure to Object to Prosecutor's Inflammatory Remarks during Summation

Finally, petitioner asserts that counsel was ineffective when he failed to object to certain inflammatory remarks which appealed to the jury's fears and sympathy for the victim. The prosecutor reminded the jury that while the victim's father had to go to the cemetery to visit his son, petitioner "gets up, and he gets to tell you whatever he wants to tell you." He described the incident as "every parent's nightmare," and called petitioner "the cause of" the victim's father's "nightmare" and the "person that caused the tragedy." Furthermore, the prosecutor repeatedly referred to the victim as a "precious 15 year old boy," "the tragedy, 15 years old," among other things, while referring to petitioner as "a murderer."

The Court of Appeals has instructed that "although counsel is to be afforded the widest latitude by way of comment, denunciation or appeal in advocating his cause, summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits." People v. Ashwal, 39 N.Y.2d 105, 110, 383 N.Y.S.2d 204 (1976) (internal quotation an citation omitted). "It is fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within 'the four corners of the evidence' and avoid irrelevant comments which have no bearing on any legitimate issue in the case." Id.

16

Based on the nature of the prosecutor's comments and New York courts' guidance on the limits of summations, the Appellate Division could not reasonably have determined that the prosecutor's comments were within the bounds of permissible rhetorical comment afforded counsel during summation and that defense counsel's failure to object to these remarks was objectively reasonable.

## IV. Prejudice

Although the Appellate Division could not reasonably apply Strickland to find that defense counsel's performance was objectively reasonable, it could reasonably find, considering the broad deference afforded its decision on federal habeas review, that defense counsel's deficient performance did not meet the prejudice prong of the Strickland test. "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Harrington, --- U.S. ---, ---, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. 2052). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 687, 104 S. Ct. 2052. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

First, the Appellate Division had a valid basis to conclude that defense counsel's failure to object to the prosecutor's inflammatory remarks during his closing, as well as to the prosecutor's questions regarding petitioner's post-arrest silence, did not result in prejudice to petitioner to such a degree that the outcome of the case could have been different. The state court could have determined that some prejudice resulted due to defense counsel's failure to object to the prosecutor's questions about petitioner's silence in the car because it gave the jury another opportunity to second-guess petitioner's testimony that Farrell was the person who

17

stabbed the victim. However, the Appellate Division could have further determined that such prejudice was minimal. By the time the prosecutor questioned petitioner about his silence in the police car, petitioner had already testified that once he arrived at the precinct and waived his right to remain silent, he deliberately chose not to tell the Assistant District Attorney and the police that Farrell had stabbed the victim. Petitioner even explained that he deliberately withheld that information was because he was afraid of what Farrell might do to his family. Thus, the Appellate Division could have concluded that defense counsel's failure to object did not meet the prejudice standard in Strickland, since an objection here could not have rebuilt the credibility of petitioner in any significant way.

Furthermore, the Appellate Division could have reasonably concluded that the prosecutor's various appeals to the jury's fears and sympathy, while inappropriate, were not seriously prejudicial to petitioner. The record demonstrates that the jury was adequately warned by the trial court judge that they were not obligated to accept any of the arguments made by the attorneys in their summations, and if they found any of the arguments to be unreasonable or illogical or inconsistent with the evidence, they were free to reject those arguments entirely.

As for the remaining two incidents of deficient performance – defense counsel's failure to object when the prosecutor (1) became an unsworn witness and pitted his credibility against that of petitioner, and (2) repeatedly accused petitioner of "lying" to the jury – the Appellate Division could have reasonably concluded that while these errors caused some prejudice to petitioner, petitioner had not demonstrated that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. 2052.

18

It is clear that petitioner's criminal case depended on his credibility. As the trial court noted when it charged the jury, "one of [the jury's] chief functions in this case is to determine the credibility of the witnesses who testified at this trial." Petitioner's affirmative defense to the felony murder charge required him to prove, inter alia, "that he had no reasonable ground to believe that any other participant [of the criminal act] was armed with [] a weapon, instrument, article or substance," and "that any other participant intended to engage in conduct likely to result in death or serious physical injury." See Penal Law § 25.00[2]. Thus, petitioner took the stand and testified that he had no idea his cousin was in possession of a knife at the time of the crime, and that he was "shocked" because did not expect Farrell to be capable of stabbing another person. He also stated that he did not expect others to get involved in the robbery of the iPod.

In testifying in this manner, petitioner sealed his own fate. For instance, petitioner testified that he knew that his cousin was a member of the Crips, which petitioner admitted was a dangerous street gang, and that Farrell's nickname was "Doom." The prosecutor asked petitioner, "How did he get the name Doom?" Petitioner responded, "I wouldn't know because I don't be around him. . . I don't see him. . . I don't be around my cousin. Did not be with him." Yet, a short moment later, petitioner admitted that on the day of the attack, he was "[j]ust hanging out with my cousin." Petitioner was asked whether he knew that his cousin had been arrested for dealing drugs on a number of occasions, to which petitioner gave the evasive answer, "Knew that, but not really." When pressed on this, petitioner explained that he did not know his cousin had been arrested for dealing drugs but that he "don't know, really know a lot about him," and that he "just hear[s] things," about his cousin. However, petitioner denied ever hearing people say that Doom carried a knife. Later, the prosecutor asked, "You know your cousin has

19

gotten in fights before, right?" Petitioner responded, "Everybody gets in fights, once in a while

... . Nobody don't live life without getting in at least one fight." Petitioner also testified that

immediately after his cousin stabbed Rose, and the other boys were scattering, petitioner

followed his cousin's instructions to meet him at his cousin's house. However, he testified that

after he was picked up by officers and interrogated at the precinct, petitioner lied to the

detectives because he was afraid of what his cousin might do to his family.

In fact, petitioner admitted on several occasions that he had lied to the police officers or

detectives:

Prosecutor:     Why did you tell Phyllis Chu on videotape that you hurt your hand
                in the park trying to stop Jamar from stomping the young boy?

Petitioner: Because I was scared.

Prosecutor:     You're scared. When you were saying that to Phyllis Chu you
                knew that was a lie, right?

Petitioner: Yes, I did.

. . .

Prosecutor:     So you don't tell the police the truth about what happened, you lie
                to the police because you were afraid of your cousin?

Petitioner:     I lied because I'm afraid for my family, not of my cousin, because
                he's danger that he can do.

Prosecutor:     What things can he do?

Petitioner:     I seen him stab someone to death. Of course, I would be scared, at
                young age.

. . .

Prosecutor:     Did you tell Ms. Chu: I know who killed Chris Rose. Can you
                help me because I'm afraid of this guy?

Petitioner:     No.

20

Prosecutor:     You just lied to her?

Petitioner:     Yes, I did.

The prosecution further attacked petitioner's credibility by having a witness testify that petitioner told him that petitioner had previously observed his cousin with a folding knife. Furthermore, the prosecution undercut petitioner's argument that he had no reason to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury, by stating that one of the boys who walked over to the bus stop with petitioner had just beat up another boy in the park while petitioner stood guard.

In addition, the Appellate Division could have reasonably found that the prosecutor's questions about statements petitioner made during the proffer session regarding whether petitioner did or did not lie to the prosecutor about who stabbed the victim were not critical to the jury's determination that petitioner had not satisfied his affirmative defense to the felony murder charge. Similarly, the state court could have determined that while the prosecutor inappropriately accused petitioner of lying to the jury, the defense counsel's failure to object was not so prejudicial that had he objected, the outcome of the trial could have been different, since the petitioner himself testified that he lied.

This is because, as the Appellate Division concluded, there was overwhelming evidence of petitioner's guilt. The prosecution had five eyewitnesses testify, among other things, that petitioner initiated the group fight by aggressively demanding the iPod and then jumping on one of the boys and putting him in a headlock in an attempt to get the iPod. They further testified that petitioner gestured for assistance by waving at the ten to fifteen boys who were watching the incident and that petitioner punched one of the four boys in the face. Two of the boys who were victims of the attack testified that they heard someone yell "poke him," after which Rose was

21

stabbed in the chest. Finally, two eyewitnesses who were not involved in the attack testified that they each had identified petitioner in lineups one day after the incident, and that both had accurately described petitioner as wearing a New York Knicks basketball jersey; they also testified that the man in the basketball jersey started the entire incident when he approached one of the victims, demanded something, and then punched one of the boys. Petitioner admitted at trial that he was the only one in the group wearing a Knicks jersey.

In sum, the record demonstrates that the Appellate Division had a reasonable basis to conclude that even if defense counsel erred by failing to object, those errors were not so serious as to deprive petitioner of a fair trial. Therefore, the Court concludes that the Appellate Division's decision to reject petitioner's ineffective assistance of counsel claim was a reasonable application of Strickland's two-part test.

## CONCLUSION

The petition for a writ of habeas corpus is denied. I have found that even under the narrow standard of federal habeas review, the Appellate Division could not have reasonably determined under Strickland that aspects of defense counsel's performance were objectively reasonable. Moreover, the question of whether the Appellate Division's determination of lack of prejudice reasonably applies Strickland is one as to which petitioner has made a substantial showing of the

possible denial of a constitutional right. See 28 U.S.C. § 2253(c)(2).[5] I therefore grant a

certificate of appeal. Furthermore, *in forma pauperis* status is granted for purposes of appeal.

**SO ORDERED.**

s/ BMC

_____
U.S.D.J.

Dated:  Brooklyn, New York
        February 11, 2013

---

[5] It could be argued that, when a habeas corpus petition is denied on the merits under an application of the Harrington standard of review, it is never appropriate to issue a certificate of appealability. The Second Circuit has quoted Slack v. McDaniel, 529 U.S. 473, 478, 120 S.Ct. 1595 (2000), as permitting issuance of a certificate only when "jurists of reason would find it debatable whether the petition states a valid claim." Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007). Yet Harrington precludes the writ unless there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S. Ct. at 786. It is hard to reconcile the "substantial showing" required by the statute and the debatability among "jurists of reason" from Richardson that are necessary for a certificate of appealability with the "no possibility" of disagreement amongst "fairminded jurists" standard for granting a petition from Harrington. The only possible means of reconciliation requires the conclusion that there must be some space between a district court's review of a state court decision and the notional review of that district court's decision by "jurists of reason," however slight that space may be.